# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 07-279C
(Judge Baskir)

**THEODORE FATHAUER**, et al

plaintiffs,

v.

**THE UNITED STATES,**

defendant.

## APPENDIX IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

RICHARD J. HIRN
5335 Wisconsin Ave NW
Suite 440
Washington, DC 20015
202-274-1812

attorney for plaintiffs

# TABLE OF CONTENTS

46 Comp. Gen. 337 (October 19, 1966) . . . . . . . . . . . . . . . . . . . . . . . . . 1

Declaration of Richard Thoman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Declaration of Robin Fox (with Job Share Agreement attached) . . . . . . . 8

Declaration of Edward Hogan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

C

46 Comp. Gen. 337, B- 159950, 1966 WL 1712 (Comp.Gen.)

COMPTROLLER GENERAL

**1 TO THE CHAIRMAN, UNITED STATES CIVIL SERVICE COMMISSION

OCTOBER 19, 1966

*337

COMPENSATION - PART-TIME EMPLOYEES - OVERTIME, PREMIUM PAY, ETC.

ALTHOUGH PART-TIME EMPLOYEES WHO WORK ON SUNDAY ARE NOT ENTITLED TO THE PREMIUM PAY AUTHORIZED IN SECTION 405 OF THE FEDERAL SALARY AND FRINGE BENEFITS ACT OF 1966, THE LEGISLATIVE HISTORY OF THE PROVISION EVIDENCING THAT ONLY FULL-TIME EMPLOYEES WHOSE REGULARLY SCHEDULED 5-DAY WORKWEEK INCLUDES SUNDAY *338 ARE INTENDED TO BE COVERED BY THE ACT, THEY ARE ENTITLED TO OVERTIME COMPENSATION FOR HOURS WORKED IN EXCESS OF 8 HOURS PER DAY, SECTION 404 OF THE ACT PROVIDING THE OVERTIME BENEFITS NOT RESTRICTING THE BENEFITS TO FULL-TIME EMPLOYEES.

COMPENSATION - PREMIUM PAY - LIMITATIONS ON PAYMENT.

FULL-TIME CLASSIFIED AND WAGE BOARD EMPLOYEES WHOSE REGULARLY SCHEDULED TOUR OF DUTY INCLUDES A PERIOD OF SERVICE LESS THAN 8 HOURS ANY PART OF WHICH FALLS BETWEEN MIDNIGHT SATURDAY AND MIDNIGHT SUNDAY ARE ENTITLED TO PREMIUM PAY FOR THE NUMBER OF HOURS WORKED THAT ARE NOT IN EXCESS OF THE NUMBER OF HOURS REGULARLY SCHEDULED FOR THE PERIOD, AS THE WORDS 'EIGHT-HOUR PERIOD OF SERVICE ' USED IN SECTION 405 OF THE FEDERAL SALARY AND FRINGE BENEFITS ACT OF 1966 ARE A LIMITATION UPON THE NUMBER OF HOURS FOR WHICH PREMIUM PAY MAY BE MADE FOR THE PERIOD OF SERVICE AND NOT A REQUIREMENT THAT AN EMPLOYEE HAVE A REGULARLY SCHEDULED 8-HOUR PERIOD OF DUTY ON THE DAY FOR WHICH THE PREMIUM COMPENSATION IS PAYABLE.

THIS REFERS TO YOUR LETTER OF AUGUST 24, 1966, SUBMITTING FOR OUR COMMENTS A COPY OF A PROPOSED FPM LETTER PERTAINING TO CERTAIN AMENDMENTS MADE BY THE FEDERAL SALARY AND FRINGE BENEFITS ACT OF 1966, PUBLIC LAW 89-504, TO THE FEDERAL EMPLOYEES PAY ACT OF 1945, AS AMENDED. THE PROPOSED LETTER WOULD SUPPLEMENT THE INFORMATION CONTAINED IN FPM LETTER NO. 550-16, DATED AUGUST 5, 1966, TO PROVIDE THAT PART-TIME EMPLOYEES ARE ENTITLED TO SUNDAY PREMIUM PAY IF OTHERWISE ELIGIBLE AND TO OVERTIME COMPENSATION FOR HOURS WORKED IN EXCESS OF 8 PER DAY.

REFERRING TO PREMIUM PAY FOR SUNDAY WORK UNDER SECTION 405 OF PUBLIC LAW 89-504 YOU NOW PROPOSE TO SAY THAT AN EMPLOYEE WITH A REGULARLY PREARRANGED TOUR OF LESS THAN 40 HOURS A WEEK IS ENTITLED TO PREMIUM PAY FOR SUNDAY WORK FOR THAT PART OF HIS REGULARLY SCHEDULED TOUR OF DUTY, ANY PART OF WHICH IS WITHIN THE PERIOD BEGINNING AT MIDNIGHT SATURDAY AND ENDING AT MIDNIGHT SUNDAY. IN SUPPORT OF SUCH ACTION YOU EXPRESS THE BELIEF THAT THE EVIDENT INTENT OF THE TWO PREMIUM

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PAY PROVISIONS CITED HEREIN IS TO DISCOURAGE AGENCIES FROM REQUIRING EMPLOYEES TO WORK MORE THAN 8 HOURS IN ANY DAY OR TO WORK ON SUNDAYS UNLESS IT IS UNAVOIDABLE WHICH IS CLEARLY AS APPLICABLE TO PART-TIME AS TO FULL-TIME EMPLOYEES. IN ADDITION, YOU POINT OUT THAT THE LANGUAGE OF THE STATUTE DOES NOT LIMIT THE COVERAGE OF SUCH PROVISIONS TO FULL-TIME EMPLOYEES.

SUBSECTIONS 405/C) AND 405/F) OF THE FEDERAL SALARY AND FRINGE BENEFITS ACT OF 1966 (5 U. S. C. 5546 AND 5544) AMENDED (1) THE FEDERAL EMPLOYEES PAY ACT OF 1945, AS AMENDED, AND (2) SECTION 23 OF THE INDEPENDENT OFFICES APPROPRIATION ACT OF 1935, TO REQUIRE PREMIUM COMPENSATION FOR SUNDAY WORK TO CLASSIFIED AND WAGE BOARD EMPLOYEES AS FOLLOWS:

> **2 * * * THAT EMPLOYEES SUBJECT TO THIS SECTION WHOSE REGULAR WORK SCHEDULE INCLUDES AN EIGHT-HOUR PERIOD OF SERVICE ANY PART OF WHICH IS WITHIN THE PERIOD *339 COMMENCING AT MIDNIGHT SATURDAY AND ENDING AT MIDNIGHT SUNDAY SHALL BE PAID EXTRA COMPENSATION AT THE RATE OF 25 PER CENTUM OF HIS HOURLY RATE OF BASIC COMPENSATION FOR EACH HOUR OF WORK PERFORMED DURING THAT EIGHT-HOUR PERIOD OF SERVICE.

S. REPT. NO. 1187, 89TH CONG., 2ND SESS. 4, ON H. R. 14122 WHICH BECAME PUBLIC LAW 89-504 CONTAINS THE FOLLOWING PERTINENT STATEMENT IN EXPLANATION OF THE PROVISIONS OF SECTION 405:

> SECTION 405 APPLIES TO CLASSIFIED AND WAGE BOARD EMPLOYEES A SIGNIFICANT LIBERALIZATION GRANTED POSTAL EMPLOYEES IN 1965. THIS SECTION REQUIRES A PREMIUM OF 25 PERCENT OF BASE PAY FOR ANY EMPLOYEE WHOSE REGULARLY SCHEDULED 5-DAY WORKWEEK INCLUDES SUNDAY. THE PREMIUM WILL BE PAID FOR THE ENTIRE 8-HOUR PERIOD OF SERVICE REGARDLESS OF THE NUMBERS OF HOURS WHICH ACTUALLY OCCUR ON SUNDAY. THIS IS IDENTICAL TO THE PROVISIONS FOR REGULAR POSTAL EMPLOYEES ENACTED LAST YEAR.

THE HEARINGS BEFORE THE COMMITTEE ON POST OFFICE AND CIVIL SERVICE, UNITED STATES SENATE, 89TH CONG., 2ND SESS., ON H. R. 14122, HELD ON APRIL 20, 21, 22, 25, 26 AND 27, 1966, BEGINNING ON PAGE 4, SPEAKS IN PERTINENT PART AS FOLLOWS CONCERNING THE NEW SUNDAY PAY PROVISIONS:

> THE HOUSE BILL, H. R. 14122, ADDS NEW * * * SUNDAY PAY BENEFITS FOR MOST FEDERAL EMPLOYEES. EQUITY ALLOWS NO ALTERNATIVE BUT TO CONCUR IN THE PROPOSALS TO EXTEND TO ADDITIONAL GROUPS * * * PREMIUM PAY AT 25 PERCENT OF BASE RATES FOR NONOVERTIME WORK ON SUNDAY.
>
> * * * CONGRESS LAST YEAR PRESCRIBED PREMIUM PAY FOR NONOVERTIME SUNDAY WORK OF POSTAL EMPLOYEES; IT IS EQUITABLE TO EXTEND THE SAME POLICY TO OTHER SALARIED EMPLOYEES AND TO THOSE PAID UNDER WAGE-BOARD SCHEDULES.

FROM THE FOREGOING STATEMENTS IT APPEARS TO HAVE BEEN THE INTENT OF CONGRESS TO GRANT TO EMPLOYEES SUBJECT TO THE FEDERAL EMPLOYEES PAY ACT OF 1945, AS AMENDED, AS WELL AS TO WAGE BOARD EMPLOYEES, THE SAME PREMIUM PAY FOR SUNDAY WORK GRANTED TO POSTAL EMPLOYEES IN 1965. THE PROVISION FOR THE 25 PERCENT PREMIUM PAY FOR POSTAL EMPLOYEES IS CONTAINED IN SECTION 5/B) OF THE FEDERAL EMPLOYEES SALARY ACT OF 1965, PUBLIC LAW 89-301, APPROVED OCTOBER 29, 1965, AMENDING 39 U. S. C. 3573. IN S. REPT. NO. 896 ON H. R. 10281 WHICH BECAME PUBLIC LAW 89-301, THE FOLLOWING STATEMENT APPEARS (SPEAKING OF EMPLOYEES OF THE POSTAL SERVICE): 'A SPECIAL PREMIUM PAY OF 25 PERCENT OF THE HOURLY RATE WILL BE

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PAID TO REGULAR EMPLOYEES WHOSE 5-DAY WORK SCHEDULE INCLUDES AN 8-HOUR SHIFT ANY PART OF WHICH OCCURS ON SUNDAY;,

WHILE THE LITERAL LANGUAGE OF SUBSECTIONS 405/C) AND 405/F) OF PUBLIC LAW 89-504 DOES NOT RESTRICT THE BENEFITS IN QUESTION TO FULL-TIME EMPLOYEES WE BELIEVE THE LEGISLATIVE HISTORY PREVIOUSLY REFERRED TO SUPPORT THE VIEW THAT ONLY FULL-TIME EMPLOYEES WERE INTENDED TO BE COVERED THEREBY AND, THEREFORE, WE CONCLUDE THAT PART-TIME EMPLOYEES ARE NOT ENTITLED TO PREMIUM PAY FOR SUNDAY WORK.

**3 ON THE OTHER HAND WE REGARD THE WORDS 'EIGHT-HOUR PERIOD OF SERVICE ' APPEARING IN THE QUOTED PROVISIONS AS A LIMITATION UPON THE NUMBER OF HOURS FOR WHICH PREMIUM PAY MAY BE MADE FOR THE PERIOD OF SERVICE AND NOT AS REQUIRING THAT THE EMPLOYEE HAVE A REGULARLY SCHEDULED 8-HOUR PERIOD OF DUTY FOR THE DAY FOR WHICH SUCH PREMIUM COMPENSATION *340 IS OTHERWISE PAYABLE. THUS, A FULL-TIME EMPLOYEE WHOSE REGULARLY SCHEDULED TOUR OF DUTY INCLUDES A PERIOD OF SERVICE OF LESS THAN 8 HOURS ANY PART OF WHICH FALLS BETWEEN MIDNIGHT SATURDAY AND MIDNIGHT SUNDAY IS ENTITLED TO PREMIUM PAY FOR THE NUMBER OF HOURS WORKED NOT IN EXCESS OF THE NUMBER OF HOURS REGULARLY SCHEDULED FOR SUCH PERIOD.

AS TO THE OVERTIME COMPENSATION PROVISIONS CONTAINED IN SECTION 404 OF PUBLIC LAW 89-504 (5 U. S. C. 5542), WE AGREE THAT THE LANGUAGE THEREOF DOES NOT RESTRICT THE BENEFITS TO FULL-TIME EMPLOYEES AND WE HAVE FOUND NOTHING IN THE LEGISLATIVE HISTORY OF THIS OR RELATED STATUTES WHICH WOULD WARRANT A CONCLUSION THAT SUCH RESTRICTION WAS SO INTENDED. THEREFORE, UNDER SECTION 404 OUR VIEW IS THAT PART-TIME EMPLOYEES ARE ENTITLED TO OVERTIME COMPENSATION FOR HOURS WORKED IN EXCESS OF 8 PER DAY.

WE SUGGEST THE PROPOSED FPM LETTER BE REVISED TO ACCORD WITH THE FOREGOING.

46 Comp. Gen. 337, B- 159950, 1966 WL 1712 (Comp.Gen.)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**THEODORE FATHAUER**, et al,

plaintiffs,

v.

**THE UNITED STATES,**

defendant.

## DECLARATION OF RICHARD L. THOMAN, Jr.

I, Richard L. Thoman, Jr., hereby declare that:

1. I am a Meteorologist employed by the National Weather Service as a GS-13 Lead Forecaster at the Weather Forecast Office in Fairbanks, Alaska. I have 25 years of experience as a professional meteorologist, 19 of which have been with the National Weather Service.

2. Like each of the 122 NWS forecast offices, the Fairbanks Forecast Office is staffed by one or more forecasters 24 hours a day, seven days a week, in order to prepare routine forecasts and to monitor developing weather and issue warnings of imminent severe weather.

3. Forecasters at our office and at most other NWS forecast offices are regularly scheduled to work 10 eight-hour shifts each pay period for a total of 80 hours a pay period. Forecasters are rotated through a

series of day, evening and midnight shifts on varying days of the week through a rotational work schedule.

4. In August, 2004 I and another GS-13 Lead Forecaster at our office, Theodore Fathauer, began a "job-sharing" arrangement by which Ted and I split an 80-hour biweekly work schedule. This has facilitated our ability to pursue graduate degrees; I am currently earning a Ph.D.

5. In the typical forecast office, there is a rotational work sequence so that, as a general rule, there will be a Lead Forecaster on each shift who is responsible for issuing forecasts and warnings in a timely fashion. It takes five full-time Lead Forecasters to ensure that there is generally a Lead Forecaster on each of the 21 shifts each week (three shifts a day x seven days a week). There are four full-time Lead Forecasters plus Ted and me, who split one of the Lead Forecaster rotational work sequences. This can be seen on the attached sample work schedule from March and April, 2006, on which Ted Fathauer and I are designated "L5a" and "L5b" respectively. (Our initials appear below that designation). Our work assignments for a four-week period appear in a vertical column under our initials. The number that appears indicates the hour on which that shift begins if we are scheduled to work on a particular day. For example, a "7" indicates that we or another forecaster is scheduled to begin an eight hour

shift at 7 a.m.; a "15 " indicates that we are scheduled to begin an eight hour shift at 1500 – or 3 p.m.; a "23" indicates that we are scheduled to begin an eight hour shift at 2300 – or 11 p.m. Ted and I are each generally scheduled to work 40 hours each biweekly pay period.

6. We are periodically scheduled to work shifts on Sundays. For example, on the attached schedule I worked on Sunday, April 1, and Sunday, April 8, 2006. Ted Fathauer was scheduled to work on Sunday, March 18; Sunday, March 25; and Sunday, April 8, 2006.

7. Before I began working a part-time work schedule, I earned 25% differential every time I was scheduled to work on a Sunday. However, I have not received Sunday differential since I began working a part-time work schedule in 2004. Attached to this declaration is a list of the number of Sundays on which I worked since pay period 17 in 2004, when I began working a part-time schedule. I have lost the equivalent of several weeks pay as a result of not receiving Sunday differential.

I declare under the penalty of perjury that the foregoing is true and correct.

[signature]

RICHARD L. THOMAN, JR.

Dated: 1/8/08

Richard L. Thoman, Jr.

WFO Fairbanks

Sundays actually worked as Part-Time Employee

| Pay Period | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
| 01 | | 1 | 0 | 1 | 0 |
| 02 | | 1 | 0 | 1 | |
| 03 | | 0 | 0 | 0 | |
| 04 | | 0 | 0 | 0 | |
| 05 | | 1 | 1 | 0 | |
| 06 | | 0 | 2 | 0 | |
| 07 | | 2 | 1 | 1 | |
| 08 | | 1 | 0 | 0 | |
| 09 | | 0 | 0 | 1 | |
| 10 | | 1 | 0 | 1 | |
| 11 | | 0 | 0 | 1 | |
| 12 | | 1 | 1 | 0 | |
| 13 | | 1 | 0 | 0 | |
| 14 | | 0 | 0 | 0 | |
| 15 | | 1 | 0 | 1 | |
| 16 | | 1 | 1 | 0 | |
| 17 | 2 | 1 | 0 | 0 | |
| 18 | 2 | 1 | 0 | 1 | |
| 19 | 1 | 0 | 1 | 0 | |
| 20 | 0 | 0 | 2 | 2 | |
| 21 | 1 | 1 | 2 | 1 | |
| 22 | 0 | 0 | 1 | 1 | |
| 23 | 1 | 0 | 0 | 0 | |
| 24 | 1 | 0 | 0 | 1 | |
| 25 | 1 | 0 | 0 | 2 | |
| 26 | 1 | 0 | 1 | 0 | |
| Total | 10 | 14 | 13 | 15 | |

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**THEODORE FATHAUER**, et al,

plaintiffs,

v.

**THE UNITED STATES,**

defendant.

## DECLARATION OF ROBIN FOX

I, Robin Fox, hereby declare that:

1. I am a Meteorologist employed by the National Weather Service as a GS-12 General Forecaster at the Weather Forecast Office in Spokane, Washington. I have worked for the National Weather Service for over 16 years.

2. Like each of the 122 NWS forecast offices, the Spokane Forecast Office is staffed by one or more forecasters 24 hours a day, seven days a week, in order to prepare routine forecasts, to monitor developing weather, and to issue warnings of imminent severe weather.

3. Forecasters at our office, and at most other NWS forecast offices, are regularly scheduled to work 10 eight-hour shifts each pay period for a total of 80 hours a pay period. Forecasters are rotated through

a series of day, evening, and midnight shifts on varying days of the week through a rotational work schedule.

4. On November 26, 2006, I and another GS-12 General Forecaster at our office, Laurie (Koch) Nisbet, began a "job-sharing" arrangement. This enables me to continue my career while spending more time with my minor children. My husband is a lead forecaster at our office, and it was very difficult for both of us to work variable rotating shifts while providing adequate and consistent child care arrangements.

5. Under this job-share arrangement that we negotiated with NWS management, Laurie and I split an 80-hour biweekly work schedule. I am scheduled to work 40% of the shifts (32 hours per bi-week period) and Laurie is scheduled to work 60% of the shifts (48 hours per bi-week period).

6. The National Weather Service approved this job sharing arrangement because, in the words of the "Job Share Partnership Agreement", it drafted and approved:

"The implementation of this job share position will allow the agency to retain the meteorological and regional expertise of two experienced forecasters. This will also allow for greater flexibility in scheduling. Because two forecasters fill one position, impacts on the forecast staff and management caused by leave, training, severe weather and IMET

deployment would be lessened, as Laurie Koch and Robin Fox have agreed to work some shifts in the other's absence. This means fewer operational shifts would need to be worked by management or other forecasters."

A copy of the "Job Share Partnership Agreement" is attached hereto as exhibit A.

7. Since I began working for the National Weather Service, I was entitled to a 25% differential every time I worked a Sunday shift; this is a routine part of a forecaster's rotational work schedule. However, since I began this "job-sharing" arrangement in November 2005, I have not been paid the customary 25% differential when I have worked a Sunday shift, unlike the rest of my co-workers. This is particularly regrettable because when I was a full-time forecaster, I was a GS-13 Lead Forecaster, and I was required by the National Weather Service to take a downgrade to a position as a GS-12 General Forecaster as a condition of approving the job-sharing arrangement.

I declare under the penalty of perjury that the foregoing is true and correct.

ROBIN FOX

Dated: 12/28/07

NOAA National Weather Service
2601 N Rambo Rd
Spokane WA 99224

November 1, 2006

MEMORANDUM FOR: Vickie Nadolski
Regional Director
NWS Western Region

FROM: MIC WFO Spokane - John Livingston
Lead Forecaster Robin Fox
General Forecaster Laurie Koch

SUBJECT: Job Share Partnership Agreement

SUMMARY:
This memorandum establishes and defines the parameters of a job share for the position of a GS-12 General Forecaster at WFO Spokane by Robin Fox and Laurie Koch. In addition to strengthening the staff, this action would ensure the retention of two highly experienced employees, and would promote a family friendly work environment. By signature the parties agree to and accept the terms and specifications that follow.

This document represents a single agreement between the parties and is not precedent setting.

BACKGROUND:
A National Weather Service operational Forecaster position is a potential position for a job share arrangement. This agreement establishes one prototype work arrangement in Spokane to explore this staffing option. Day to day shifts are independent of each other, and each forecaster could complete complimentary focal point duties.

Initially, Robin Fox began seeking a job share arrangement so she could spend more quality time with her family. Laurie Koch is willing to partner her job in this arrangement. Both Robin and Laurie have given this concept a great deal of thought and are prepared to commit to this job partnership.

WORK ASSIGNMENT:
The assignment of responsibilities and scheduled work hours would be as follows:

Robin Fox and Laurie Koch will be individually responsible for duties assigned to the General Forecaster, including shift duties, focal point duties along with other tasks and training assigned by management, and as detailed in the attached Position Description

and GWPAS plan. Laurie Koch is a GS-12 General Forecaster. Robin Fox holds the position of a GS-13 Lead Forecaster, and in signing this agreement, agrees to take a voluntary downgrade for this job share arrangement.

Due to Robin Fox's spouse working in the same office as a Lead Forecaster, the fixed schedule will ensure they do not work the same shift. However, in rare and unusual circumstances such as severe weather, or covering emergency annual or sick leave they may be on shift together.

Robin Fox and Laurie Koch will each work a percentage of shifts that equals a full time employee position. Laurie will be scheduled for a required 6 shifts per pay period (48 hrs) and Robin will be scheduled for a required 4 shifts per pay period (32 hrs). Premium pay and night differential will be paid for shifts worked according to applicable laws, rules and regulations. Attached is a sample schedule for five pay periods, or a full rotation through a schedule, illustrating one possibility for a standard schedule. A shift refers to an assigned period of pay status, including operational or supernumerary shifts, annual or sick leave, administrative or holiday leave and other in pay status time as defined by laws, rules and regulations. Each job share incumbent will be required to work the agreed upon schedule of 60% for Laurie and 40% for Robin. Additional shifts can be requested by management to help mitigate staffing or shift scheduling concerns, assist with significant weather events, or to meet project/focal point deadlines...Both employees are expected to be team members under this agreement and to support the mission when requested or required to do so.

Training for the job sharers will be assigned in the same manner as for the remainder of the staff. The SOO posts a training schedule as a spreadsheet every six months to the internal home page. Each employee is included in this spreadsheet and they get checked off as they complete the training assignments. Appropriate links, instructions, assignments for group or WES-type training are sent by email with specific shifts designated in the schedule in some cases. Drills are included in this schedule and are distributed by email at the appropriate time. Completion of the drills is tracked by the SOO using this same spreadsheet.

Proficiency at completing assigned products and tasks for the job sharers will be done in the same manner as for other employees. This will include but is not limited to a review of products issued, performance during severe and hazardous weather, and review of objective forecast verification including improvement over MOS for temperature and POP forecasts, and POD and FAR for short fused and long fused warnings.

Review of assigned focal point duties for the job sharers will be done in the same manner as for other employees. This will include a review of tasks completed and progress made towards improving the information available, products and services offered, impact on office operations, or whatever is appropriate. The job sharers will share the focal point duty of Climate Focal Point. However, this focal point duty may be changed.

Normal tracking and review of training, proficiency and completion of focal point duties will be completed every six months and at GWPAS review time. For the job sharers, management's review of all of these items will normally occur every other month by the 15th day of January, March, May, July, September and November.

OTHER STIPULATIONS:
Leave, Holidays, Retirement, Health Insurance, Life Insurance, and other job benefits will be administered according to applicable laws, regulations, and labor agreements for the Department of Commerce, NOAA, and the National Weather Service.

The job sharers may seek outside employment according to the established rules and regulations. This includes ensuring there is no conflict of interest. The job sharers must also be available for call back duty for severe weather, emergencies, sick leave, IMET dispatch and other appropriate reasons.

The following ensures sufficient time on non-operational administrative shifts for the job sharers to remain proficient, and complete required training and focal point duties.

- Both job sharers would be required to complete the same training, drills, weather simulations and other mandatory exercises as other full time forecasters in the same job series and grade. If either employee experiences problems meeting these deadlines, the employee must notify the MIC or designee as soon as possible.
- The job sharers will complete the duties of one focal point using the combined efforts of the two of them. They will share the same focal point duty.
- Both job sharers start with solid and lengthy experience forecasting in the region. Proficiency is excellent to begin with and shall be monitored by management using metrics such as review of products issued, performance during severe and hazardous weather, and review of objective forecast verification including improvement over MOS for temperature and POP forecasts, and POD and FAR for short fused and long fused warnings.
- For the current general forecaster rotation in the planning schedule there are 12 admin shifts for each forecaster for each 10 week cycle. The job share has a split of 60% for Laurie Koch and 40% for Robin Fox. In order that both job sharers have equal amounts of time to complete training and focal point duties the following distribution of operations and administrative shifts will be used. The numbers are for a 10 week cycle of the planning schedule.

| | Total Shifts | Percent | Operations Shifts | Percent | Admin Shifts | Percent |
|---|---|---|---|---|---|---|
| Total | 50 | 100% | 38 | 100% | 12 | 100% |
| Robin Fox | 20 | 40% | 14 | 37% | 6 | 50% |
| Laurie Koch | 30 | 60% | 24 | 63% | 6 | 50% |

IMPACTS TO THE NATIONAL WEATHER SERVICE:

The implementation of this job share position will allow the agency to retain the meteorological and regional expertise of two experienced forecasters. This will also allow for greater flexibility in scheduling. Because two forecasters fill one position, impacts on the forecast staff and management caused by leave, training, severe weather and IMET deployment would be lessened, as Laurie Koch and Robin Fox have agreed to work some shifts in the other's absence. This means fewer operational shifts would need to be worked by management or other forecasters. In addition, both forecasters are active in outreach activities and are willing to support these activities under their job share partnership.

QUALIFICATIONS:
Robin Fox has been a Lead Forecaster at the National Weather Service Spokane office for the last 8 years, and has been working with the agency for over 15 years. Laurie Koch has been a General Forecaster at the National Weather Service Spokane for the last 1.5 years, prior to that she was a Forecaster in the National Weather Service Missoula for 2.5 years and has been with the agency for over 8 years. Both individuals have met or exceeded performance expectations and have received numerous awards. In addition, both are active in outreach and have made significant contributions in the office.

CONTINGENCIES:
In the event that one of the job share partners decides to resign or transfer from the unit or is separated for any reason, the position will automatically revert to a full-time position with the requirement that the remaining job share partner will assume the full time requirements of the position. Once this job share arrangement is executed, the two parties will not be able to revert back to their old positions without following standard recruitment procedures, including those noted in this document.

Performance that does not meet the established standards for the position will be handled initially using existing procedures, starting with counseling, then assignment of appropriate training or proficiency exercises and then moving to the Performance Improvement Plan procedures. The job share is established and exists at the discretion of management. Performance by one or both of the job sharers that does not meet the established standards may result in an adjustment of the ratio of the shift distribution to 50/50 or cancellation of the agreement.

Conduct problems by the job sharers will be handled initially using existing procedures, starting with counseling, verbal warnings, written warnings, adverse action and removal. The job share is established and exists at the discretion of management.

If it is necessary to end this job sharing arrangement for any reason, the agency may reassign one or both of the job sharers to other part-time or full-time positions at the discretion of management.

IMPLEMENTATION:
The implementation date for this arrangement is pay period 24, which begins November 26, 2006.

REFERENCES:

OPM, 1990. Job Sharing for Federal Employees

OPM, 2004. Part-Time Employment and Job Sharing Guide
http://www.opm.gov/Employment_and_Benefits/WorkLife/OfficialDocuments/handbooksguides/PT_Employ_JobSharing/pt05.asp

By signature the parties understand and accept the impacts, implementation, contingencies, work assignments and other items as set out in this document.

Robin Fox
Forecaster
WFO Spokane

Laurie Koch
Forecaster
WFO Spokane

John Livingston
Meteorologist In Charge
WFO Spokane

Jonathan Fox
Local Union Representative
NWSEO

Vickie Nadolski
Regional Director
NWS Western Region

**Benefits for Part-Time Permanent Employees**
**Part-Time Employment and Job Sharing Guide**
**Office of Personnel Management**

## Leave and Holidays

Employees earn annual and sick leave on a prorated basis depending on the number of hours worked per pay period. An employee with less than 3 years of service earns 1 hour of annual leave for each 20 hours worked; with 3 but less than 15 years of service, the employee earns 1 hour for each 13 hours worked; and with 15 or more years of service earns 1 hour for each 10 hours worked.

Part-time employees earn 1 hour of sick leave for each 20 hours worked. Part-time employees are also eligible for other kinds of leave and are covered by the rules governing the Family and Medical Leave Act of 1993 and the Federal Employees Family-Friendly Leave Act.

If a holiday falls on a day the employee normally works, the employee is paid for the number of hours he or she was scheduled to work, not to exceed 8 hours, except for an employee on a compressed work schedule. A part-time employee is not entitled to a holiday which falls on a day the employee is not normally scheduled to work.

## Retirement

Retirement annuities are based on an employee's length of service and the highest annual base pay received for any three consecutive years. Each year of part-time service counts as one full year toward the length of service requirement. However, the annuity calculation for periods of part-time service after April 6, 1986, is prorated to reflect the difference between full-time and part-time service. Employees who are considering a change to a part-time work schedule should obtain an estimate of their retirement benefits from their agency's benefits office.

## Health Insurance

Part-time employees who participate in the Federal Employees Health Benefits Program receive the same coverage as full-time employees but pay a greater percentage of the premium because the Government's share is prorated based on the number of hours the employee is scheduled to work each week. For example, an employee on a 20-hour-per-week schedule receives one-half the Government contribution towards the premium.

## Life Insurance

A part-time employee is eligible to participate in the Federal Employees Group Life Insurance Program. The amount of insurance for which an employee is eligible is based on the part-time employee's annual salary applicable to his or her tour of duty.

### Qualification Determinations

Part-time work is prorated for determining qualification requirements. For example, an employee who works 20 hours a week would receive credit for 6 months of experience at the end of 12 months of work.

### Pay

Gross pay is computed by multiplying the employee's hourly rate of basic pay by the number of hours worked during the pay period. Except for certain employees on alternative workweek schedules, overtime rates apply only to the hours in excess of 8 hours in a day or 40-hours in a week. Non-overtime hours above those normally scheduled are paid at the basic rate of pay (5 U.S.C. 5542 and Fair Labor Standards Act).

### Reduction in Force

In a reduction in force (RIF), part-time employees compete separately from full-time employees. A part-time employee can compete only for other part-time jobs and has no assignment rights to full-time positions. Similarly, a full-time employee has assignment rights only to full-time positions and cannot displace a part-time employee.

### Adverse and Performance-based Actions

Part-time employees have the same rights as full-time employees when disciplinary actions or performance-based actions are taken against them. Adverse and/or performance-based actions include suspensions, removals, furloughs, and reductions in grade. (A reduction in scheduled hours is not subject to adverse action procedures.)

### Service Credit

A part-time employee earns a full year of service for each calendar year worked (regardless of schedule) for the purpose of computing dates for the following:

- retirement eligibility;
- career tenure;
- completion of probationary period;
- within-grade pay increases;
- change in leave category; and
- time-in-grade restrictions on advancement.

### Personnel Ceilings

The regular, non-overtime hours worked by part-time employees count toward an agency's full-time equivalent (FTE) work year personnel ceiling. A part-time position counts as a percentage of a full-time job. For example, an employee who works 24-hours a week is counted as 0.6 FTE.

## Ending or Changing a Job Sharing Arrangement

The decision to approve or to terminate an arrangement is at management's discretion. To avoid misunderstandings, this point should be made clear before the job sharers begin work. In addition, it should be decided in advance what will be done if one partner is unable to maintain the agreed-upon schedule, goes on extended leave, resigns or takes another job. It is wise to clearly state at the beginning whether the remaining partner will be expected to work full-time until another job sharer is found. If it is necessary to end a particular job sharing arrangement, the agency may reassign one or both of the job sharers to other part-time positions or to other full-time positions. If both employees decide they would like to end the job share arrangement to become full-time employees, the employees understand that the arrangement would not be cancelled unless there was another comparable full-time position available in the office.

## Applying for Merit Promotion Vacancies

Agencies may not refuse to accept applications from individuals solely because they are part of a job sharing team. Each job sharer must be evaluated individually to determine eligibility. If both are among the best qualified, they must be referred as a team to the selecting official.

However, in situations where a job sharing arrangement would not be appropriate, the selecting official can select a single candidate from among the best qualified. (A member of a job sharing team may also apply as an individual and be considered on that basis.)

## A Sample Job Share Schedule

| | | |
|---|---|---|
| Pay Period 1 | S | - |
| | M | 08-16-LK |
| | T | 08-16-LK |
| | W | 08-16-LK |
| | R | 08-16-RF |
| | F | 07-15-RF |
| | S | - |
| | S | - |
| | M | 10-18-RF |
| | T | 10-18-RF |
| | W | 10-18-LK |
| | R | 10-18-LK |
| | F | 08-16-LK |
| | S | - |

| | | |
|---|---|---|
| Pay Period 2 | S | - |
| | M | - |
| | T | 08-16-LK |
| | W | 08-16-LK |
| | R | 08-16-LK |
| | F | 07-15-RF |
| | S | 07-15-RF |
| | S | 07-15-RF |
| | M | 07-15-RF |
| | T | - |
| | W | - |
| | R | 10-18-LK |
| | F | 10-18-LK |
| | S | 15-23-LK |

| | | |
|---|---|---|
| Pay Period 3 | S | 15-23-LK |
| | M | 15-23-LK |
| | T | 15-23-RF |
| | W | 15-23-RF |
| | R | - |
| | F | - |
| | S | 23-07-LK |
| | S | 23-07-LK |
| | M | 23-07-LK |
| | T | 23-07-RF |
| | W | 23-07-RF |
| | R | - |
| | F | - |

| | | |
|---|---|---|
| | S | 18-02-LK |
| Pay Period 4 | S | 18-02-LK |
| | M | 18-02-RF |
| | T | - |
| | W | - |
| | R | 08-16-RF |
| | F | 07-15-LK |
| | S | 15-23-LK |
| | S | 15-23-LK |
| | M | - |
| | T | 08-16-LK |
| | W | 08-16-LK |
| | R | 08-16-RF |
| | F | 10-18-RF |
| | S | - |

| | | |
|---|---|---|
| Pay Period 5 | S | - |
| | M | 08-16-RF |
| | T | 07-15-RF |
| | W | 07-15-LK |
| | R | 07-15-LK |
| | F | 07-15-LK |
| | S | - |
| | S | - |
| | M | - |
| | T | 18-02-LK |
| | W | 18-02-LK |
| | R | 18-02-LK |
| | F | 18-02-RF |
| | S | 18-02-RF |

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**THEODORE FATHAUER**, et al, :
plaintiffs, :
v. :

**THE UNITED STATES,** :
defendant. :

## DECLARATION OF EDWARD K. HOGAN, JR.

I, Edward K. Hogan, Jr., hereby declare that:

1. I am a Meteorologist employed by the National Weather Service (an agency of the U.S. Department of Commerce) as a GS-12 Forecaster at the Center Weather Service Unit ("CWSU") located at the FAA's Air Route Traffic Control Center in Islip, New York.

2. There are 21 CWSUs collocated at FAA Air Route Traffic Control Centers around the country. There are generally four NWS forecasters stationed at each CWSU who provide FAA air traffic controllers and air traffic managers with current aviation forecasts. In order to assist the FAA, a NWS forecaster is generally on duty at each CWSU from 6 am to 10pm, seven days a week.

3. CWSU forecasters are regularly scheduled to work 10 eight-hour shifts each pay period. However, I and another forecaster "share" a job at the Islip CWSU. Since October 16, 2005, I have been scheduled to work four shifts each pay period instead of ten, for a total of 32 hours a pay period. I generally work weekends in order to watch my preschool aged son during the week while my spouse is working. The other forecaster at the Islip CWSU, with whom I "job share," works six shifts each pay period for a total of 48 hours a pay period. Combined, our part-time schedule equals the full-time schedule of a prototypical forecaster. The availability of this "job-share" arrangement has provided me with an opportunity to balance family responsibilities with the need for additional income and my desire to continue my career.

4. I have worked most Sundays since October, 2005. However, unlike the forecaster who works the other Sunday shift, I do not receive 25% Sunday differential.

I declare under the penalty of perjury that the foregoing is true and correct.

Edward K. Hogan, Jr

EDWARD K. HOGAN, JR.

Dated: 1/15/08